Appeal Number 20-1404 Attorney Dickinson, please introduce yourself on the record. Attorney Thomas Dickinson for the Plaintiff Appellate Lisa O'Rourke. Good morning. May I proceed? Yes, you may. Your Honor, may I reserve three minutes for rebuttal? Yes, three minutes. Good morning and may it please the Court. This is an appeal from a grant of summary judgment in an FMLA case. My client, the Plaintiff Lisa O'Rourke, was an employee at Tiffany's facility in Cumberland, Rhode Island, where she began her employment there in the year 2010. She found in 2013 that she suffered from a genetic condition called BRCA2, which necessitated a series of surgeries in order to prevent her from suffering from cancers. In late 2013, she sought a medical leave for the first of these surgeries, which was granted. She was on leave from her position from mid-January to mid-May of that year. Later that year, she needed a follow-up surgery in order to follow up on some of the procedures that she had had. She requested that leave in July of 2014. She was out for a little less than a month between July and August of 2014. Then, again, in the fall of 2015, she needed to have yet a third surgery in order to deal with some problems that had arisen in the first and second surgeries. She requested a third leave, which would have taken place in January or early 2016. She requested that leave in October of 2015, having told her supervisor a few weeks earlier that she was going to be formally requesting it. She did formally request it in October of 2015. All during this time, or at least when Ms. O'Rourke was on her first leave in early 2014, a new vice president came on board at Tiffany's in New York, Mr. Wayne Howard, who had supervision over the facility in Cumberland, at least the portion of the facility where Ms. O'Rourke worked. Mr. Howard was the vice president of manufacturing. The evidence shows, and I submit that the basis for Ms. O'Rourke's claim is, a series of events involving Mr. Howard, which demonstrated his animus towards her as a result of her having taken these needed medical leaves. This animus began before he even met her, while she was on leave in 2014, when he questioned, first of all, her excessive absenteeism, and when she sought a second leave later in 2014, he referred to that leave as unfortunate, and he told her supervisor, or he told personnel, in any event, and her supervisor, that they would have to be carefully evaluating her performance. Also during this time, he questioned her high employee rating, even though he had not yet worked with her. He falsely claimed that it was common for him to question high ratings, but he admitted in his deposition that he could not recall ever questioning another employee's high rating. Mr. Dickinson, that email in Texta, he said he had concerns with her performance, he wanted to do a review, and it was the context of that that he then said, unfortunately, she will be out again. How is that showing, I mean, it was unfortunate she was going to be out again. Well, that's certainly one inference that you can draw from it, your honor. However, at this stage, at the summary judgment stage, the view of the evidence in the language of this court has to be in the most hospitable light to Ms. O'Rourke, and I suggest that given Mr. Howard's other statements and other approaches to her or treatment of her, it's certainly capable of supporting an inference that he saw the leave as unfortunate because she was going to be out and because he didn't want to have an employee out, whom he had already questioned about excessive absenteeism. And that, taken together with the fact that he didn't question the performance of any other employees, or I should say he didn't question the reviews of any other employees, or at least none that he could recall at the time that he was deposed, Could you remind me what the context of the excessive absenteeism statement was? Absolutely. Could you remind me what the record shows about the statement where he questioned her, quote, excessive absenteeism? I thought that's not the language of the employer who says that, the supervisor. I thought that was the language of counsel describing what he said. Is that wrong?  My recollection is that he questioned her absences from work, and my recollection was that he questioned that to her supervisor. How did he question that? I'm not seeing that as I look here. I'm sorry, Your Honor, I don't have a record reference right in front of my mind on it, except to say that he certainly called, he did call the leave unfortunate, and he... He definitely said it was unfortunate she wouldn't be there so that he could review her performance. Right. It's just not the same, necessarily, as saying that the leave was unfortunate. Well, I think either inference can be drawn, and I submit that... Okay, I get that, but then you say, but one thing that would tip the inference, and make it not speculative to say that it was a hostile statement, is the fact that he otherwise questioned her absenteeism. I just think that's a pretty critical piece of evidence for you, and it would be helpful to know what that evidence actually shows on that score. I will track that down before my rebuttal, Your Honor. The other thing that he did, and I think this is an important point, the other thing that he did is he created a new position for her. She's had her first leave in 2014. She's had her second leave in 2014, and towards the end of 2014 he now creates a new position for her within the same unit, but a new position. She goes from being Director of Purchasing and Planning to Director of Strategic Sourcing. Within a year, he decides that he needs to eliminate that position, and his explanation for that and his deposition is that the position made no sense. So one could certainly... My understanding is that he changed the position. So that her position as Director of Sourcing encompassed or included her previous duties as Director of Purchasing? Yes, yes, it did. Okay. Five minutes remaining. Thank you. And then he says in deposition when explaining why within a few months, well within a year, he begins to decide that he's going to eliminate that position. He says it's because the position made no sense. This is a position that he created and created specifically for her. And so I think from that one can infer, and there was a suggestion in the record, that this was not the first time that he had created a position for somebody for purposes of eliminating them. Well, what was the other? You say there's a suggestion in the record he did that for. What are you pointing to? I believe there was testimony from one of the other. I believe there was testimony from Ms. O'Rourke that her supervisor had told her that he did this before. But that's not admissible evidence. Well, it supports the inference whether it's admissible or not. It, again, demonstrates a pattern on his case. How can it demonstrate a pattern if it's inadmissible? Well, it's admissible for purposes of showing a pattern. So what's legal principle evidence that is otherwise excludable as hearsay is admissible for the purposes of showing a pattern? What's the authority for that? I'm sorry, Your Honor? What's the authority for that? Well, I think it certainly shows whether it's admissible or not and whether it can be considered by a jury or not. It certainly tells Ms. O'Rourke that this is a practice that he has engaged in in the past. And whether he had engaged in it in the past or not, this particular episode where he creates this position for her after having been concerned about her leaves and having described them as unfortunate and having told her supervisor that she needed to keep an eye on her and watch her closely, he creates a position for her and then within 10 months eliminates the position as a basis for terminating her, saying that the position made no sense. The position that he created for her. So he's put her into a position that makes no sense. And certainly that supports the inference that he did that for purposes of eliminating her. Well, it might if there was some evidence he was concerned about her leaves. So I think that it is. I mean, when you come back, it would be helpful to me to know what is the evidence that indicates he was concerned about her leave beyond the use of the word unfortunate. Well, and the fact that he said that she needed to be monitored closely and there were other things that he did. He blamed her for inventory problems. Yeah, but we're trying to figure out why he was concerned about her conduct. If the reason was that she was taking leave, then you have a case. If it was not because of that, then you don't. Yes, and I think that's a jury question because we do have some evidence of it. And the question is whether or not the other pieces of evidence fit together with that evidence to support. So just to reiterate the point, there's some evidence that seems to be the unfortunate reference. And then some other evidence you need to identify, which shows a concern about excessive absenteeism. Well, and and also the manner in which he directed that she be closely monitored. The fact that evidence about a concern about her leave. Well, it certainly could be, of course, if that's what his concern is, that her leaves are unfortunate, that he's criticizing her for things that are happening while she's on leave. It certainly could be and a jury could so fine. And I think what the judge did here and what we have to be cautious about is parceling all these little these pieces of evidence into little segments. And treating each of them as if they independently have to support, have to support a conclusion that there's a causal connection here. If she had a if she had a heart attack and he told her boss that was unfortunate, would you suggest that a jury could draw an inference from that that he was against people who had bad hearts taken together with everything else that he did with regard to her? Yes, I might. I might. But when you say taken together with everything else, then that leads us to what's the what else? And I'm not hearing it here. Well, there's there's the telling that she needs to be closely monitored. There's the blaming her for inventory problems that occurred when she was on leave. There's the falsely or inaccurately blaming her for an employee who left who he said who he initially held against her time. Thank you. Have I answered your question, Your Honor? Thank you. At this time, if Attorney Dickinson could mute his device and if Attorney Collier could unmute her device and introduce herself onto the record. May it please the court. I'm Stacey Collier. I represent the appellate Tiffany and Company in this matter. Your Honor's hit it right on the head when you were addressing the question, essentially, of pretext. Plus, we are there really is nothing to demonstrate that Wayne Howard had, first of all, any knowledge of middle works, medical specific medical issues. But in addition, the information and the evidence that Dickinson points to does not lead to any sort of inference that there was anything other than legitimate, non discriminatory or non retaliatory business reasons that led to any of his conduct or decision making regarding Miss O'Rourke. The excessive absenteeism reference that you're referring to is on page 180 to page 181 of Mary Messier's deposition testimony. And you are 100 percent right. That was based on the characterization of Attorney Dickinson's co-counsel in Miss Messier's deposition testimony where she characterizes it as a question of whether Mr. Howard was concerned about excessive absenteeism. And Mary Messier says, I wouldn't say concerned. He asked, but and then it was never picked up on again. So there's nothing in the record to suggest other than counsel's characterization that that Mr. Howard made any sort of reference about excessive absenteeism with respect to Miss O'Rourke. Can I ask you the one the one point that concerned me in the record was the I guess Mr. Martin, who was there for two weeks and then left. And it does seem that Howard is concerned about the way Martin was treated, even after he's been informed, informed by the person who observed their relationship. But there's no reason to be concerned about how he was treated, given how difficult Martin was. And nonetheless, even after being informed about that, he seems to stick on this idea that somehow O'Rourke is the cause of that early departure. If there's not it, couldn't a juror conclude that that just doesn't make sense and that something must be motivating that other than the facts? I think there's certainly a record that he had asked about and he had some concerns about the sourcing function and certainly Mr. Martin's departure. I think it would be of greater concern if Miss O'Rourke was terminated for performance reasons. There's nothing on the record to suggest that anything other than the elimination of her position for an organizational restructure is what drove Mr. Howard's decision-making. Just let me just play that out. I guess most favorable to the to the plaintiff, if I'm understanding the argument, would be something like this. He's aware that she took leave. He's aware that she took leave. So the ADA claim aside for the FMLA claim, did he retaliate against her because she took leave? Well, part of the rationale for why he moved her into this position that then turns out not to be necessary had to do with the downgrading of her performance. And one of the reasons given for the downgrading of the performance was her supposed poor supervision of Martin, even though the record gives good reason to think Martin was to blame there. So why is Howard downgrading her performance for that reason? What's your answer to that? Sure. Well, first of all, he never made the decision to change her position in 2014 because of a downgrade of performance. It was because Mr. Howard was taking a very critical look at all of the areas under his supervision and made a bunch of changes. The idea that he created this position to only move her out of it pretextually is not supported by the record. Ten months had passed. He was trying to make the resources that he had available work in Cumberland. After giving that an opportunity to see if it would be successful, it was not a successful deployment of resources. It did not make sense to continue to have a group with two directors and four reports. He reorganized, restructured, and put a lot of the duties with Ms. Messier as well as with Alok Dhar in New York. I'm sorry. I thought the record suggested that once she's downgraded to a four, opposed to getting a five, that's when suddenly there's an indication she might be at risk of staying around. And then there was, I thought, a discussion about, well, maybe we should keep her on and try her out in this role. Is that wrong? No, that's not consistent with the record, Your Honor. Her position was, when we say downgraded, let's be very clear. She was downgraded from a five, which exceeds expectations, to a four, which always meets expectations, sometimes exceeds expectations. So her speculation that she went from having an excellent record to being viewed as poor is not consistent with the record or how Tiffany manages performance. It was still a very good rating. She earned the same merit increase she would have earned as a five. Just one last pass at this. I thought there was record evidence that Howard had a conversation with someone else about Aurora in which Howard wants to take more adverse action against her and was told, well, maybe we could try her in this new role where she would stay on. Is that wrong? There's no such evidence like that? So there's evidence following his making the decision, which was communicated on October 7th. There was a question when he restructured, and there was a lower-level position available. Then, yes, she was considered for that position and, in fact, offered that position. So she was offered the choice of accepting the position elimination and a severance package. Oh, I see. But that's after they've already done it. That was after, yes. Okay. And, in fact, going back to the earlier change in 2014, she testified that she viewed that as a promotion. So she did not view that as a demotion at that time if we're talking about the original change that Attorney Dickinson is alleging was problematic. You know, I think what's dispositive on this case is really Howard's knowledge or lack thereof about the reasons that she was taking leave, the specifics of her disability. There's no dispute in the record on the fact that he did not have that specific information. The recently decided case at the circuit of Brader v. Biogen affirms the circuit's view that the decision-maker needs to have that knowledge in order to make a decision based on disability. And there was a passage of 16 months between her FMLA leaves in 2014 and the decision that Mr. Howard made to eliminate her position in the fall that eliminates any causation between those two decisions. So we feel very strongly that Judge Smith's decision was well-reasoned and should be affirmed. Thank you. Judge Sellier, Judge Barron, any more questions? All set. Thank you, counsel. Thank you. Attorney Collier, you can mute your device at this time. Attorney Dickinson, please reintroduce yourself back on the record. Yes, thank you. Attorney Dickinson for Plaintiff Appellate O'Rourke. A couple of points. First of all, in response to the question about excessive absences or excessive absenteeism, I will defer to my sister's recollection of the record on that in terms of how that came up with the deposition. I think it's interesting the argument that he didn't know what her condition was. What inference do we draw from his statement about unfortunate if he didn't know what her condition was? I think that supports the inference that he thought it was unfortunate that she was taking the leave, not that it was unfortunate that she had this particular condition. There were a few other points I wanted to mention. I did make reference in the brief and the reply brief to the privilege log, which the trial judge ignored in his grant of summary judgment. I would suggest that the privilege log, which appears at pages 44 through 49 of the appendix, demonstrates that at about the time that this position was being eliminated and that Ms. O'Rourke was seeking her additional leave, they were aware that there was an FMLA issue here. Now, we don't have the contents of these communications because Tiffany has chosen not to share them with us as their right, as the magistrate judge ruled. When you say at about this time, do you mean after Howard made the decision? After Howard purportedly decided, but before the decision was executed and before a final decision was made within Tiffany. At least that's what we can infer from the privilege log. Howard may have thought he was going to do something. Frankly, I'd say Howard made that decision as early as December of 2014 when he created the new position for her that he decided didn't make any sense. The privilege log demonstrates that there were discussions about FMLA, that the decision had not finally been made because it was still an ongoing conversation within Tiffany. In fact, they did make an offer of another position. The offer of the other position, I suggest, again supports the inference that we're asking you to draw, that we asked the trial judge or a jury to draw. This was a phony position. It had never existed before. It had not gone through payroll. I think the testimony was that nobody knew where the money to fund it was going to come from because it wasn't anything that existed. When she didn't accept it, when Ms. O'Rourke didn't accept it, they didn't advertise it, and they didn't fill it. Clearly, it was a pretext in order to soften the notion of what they were doing to her. I would suggest when you take all of those inferences, remembering that a brick is not a wall, as Professor McCormick said, when you take all those inferences, as you have said you must, most hospitably to Ms. O'Rourke, that it was wrong to grant summary judgment here. A jury should be permitted to consider this evidence and draw what inferences counsel can persuade it to draw. It is not a question for the judge.  All Ms. O'Rourke is asking for is that opportunity. Thank you, Your Honors. Thank you. That concludes argument in this case. Attorney Dickinson and Attorney Collier, you should disconnect from the hearing at this time.